RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MARK LOVELL,

    *Plaintiff-Appellee*,

    *v.*

CLERMONT COUNTY SHERIFF'S OFFICE,

    *Defendant*,

JOSEPH BAILEY, ERIC MULLENIX, GREGORY PAFF, DYLAN PEMBERTON, ALEX TINCHER, and TERRA SHOUSE, in their official and individual capacities,

    *Defendants-Appellants*.

No. 26-3031

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:23-cv-00114—Stephanie K. Bowman, Magistrate Judge.

Decided and Filed:  August 4, 2026

Before:  MOORE, NALBANDIAN, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Brian C. Shrive, Jeannette E. Nichols, Daniel B. Startsman, III, CLERMONT COUNTY PROSECUTOR'S OFFICE, Batavia, Ohio, Kimberly A. Rutowski, LAZARUS LAW, LLC, Cincinnati, Ohio, for Appellants.  James Griffin O'Brien, BEY & ASSOCIATES LLC, Cincinnati, Ohio, for Appellee.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Mark Lovell brought this action against the Clermont County Sheriff's Office and six of its employees,[1] alleging in relevant part that Correctional Officers Bailey, Mullenix, Paff, Pemberton, Shouse, and Tincher used excessive force while booking Lovell into the Clermont County Jail in violation of Lovell's Fourth and Fourteenth Amendment rights.  The district court denied the officers' motion for summary judgment, concluding that they were not entitled to qualified immunity.  On interlocutory appeal, the officers' insistence on fighting the facts deprives us of jurisdiction.  Accordingly, we **GRANT** Lovell's motion and **DISMISS** the appeal.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  Initial Events

On the evening of February 27, 2021, Mark Lovell visited two bars in southwest Ohio and drank heavily.  R. 45 (Lovell Dep. at 13–18, 19) (Page ID #601–06, 607).  He does not remember the events of the night after leaving the first bar.  *Id.* at 41, 67 (Page ID #629, 655).  At approximately 11:45 p.m., other bar patrons flagged down Officer Neumeier of the Williamsburg Police Department.  R. 58-3 (Neumeier Rep. at 9) (Page ID #1304).  Officer Neumeier saw Lovell "staggering around with slurred speech."  *Id.* at 10 (Page ID #1305).  Another officer arrived to assist, and the two of them handcuffed Lovell and placed him in the back of a police car.  *Id.*  According to Officer Neumeier's report, Lovell resisted the handcuffing.  *Id.*  Inside the vehicle, Lovell kicked the divider and the door.  *Id.*  At one point Lovell was able to get both of his feet out of the car door, requiring one of the officers to pull Lovell back in.  *Id.* at 13 (Page ID #1308).  Lovell also rammed his head into the divider.  *Id.* at 10 (Page ID #1305).

---

[1]Claims against other defendants were dismissed and are not part of this appeal.  *See* R. 85 (D. Ct. Op. at 61) (Page ID #3188).

The officers transported Lovell to his home and briefly spoke with Lovell's wife, mother, and daughter. The family members requested that Lovell be taken to jail to sober up. R. 44 (McAfee-Lovell Dep. at 22–23, 65) (Page ID #501–02, 544); R. 43 (Peskin Dep. at 15) (Page ID #389). Officer Neumeier cited Lovell for disorderly conduct and resisting arrest and drove him to the Clermont County Jail. R. 58-3 (Neumeier Rep. at 10) (Page ID #1305). En route, Lovell made some threatening comments to Officer Neumeier, prompting the officer to add an aggravated menacing charge. *Id.* at 10–11 (Page ID #1305–06). Officer Neumeier contacted dispatch, informed them of Lovell's threatening statements, and requested that the jail be notified to provide assistance upon arrival. *Id.* at 11 (Page ID #1306).

Lovell arrived at the jail at approximately 12:25 a.m. on February 28. R. 58-8 (Log) (Page ID #1372). Officers Pemberton, Bailey, and Mullenix and Corporal Paff were waiting to assist. Sergeant Newsome was also present to record the events with a handheld camera. The footage from the handheld camera was provided to us in four separate video files: "Cler. Co. 261 – 00012 Cassandra Debord," 10 minutes and 26 seconds in length [hereinafter Handheld Video 1]; "Cler. Co. 262 – 00013 Cassandra Debord," 9 minutes and 7 seconds in length [hereinafter Handheld Video 2]; "Cler. Co. 263 – 00014 Cassandra DeBord," 9 minutes and 46 seconds in length [hereinafter Handheld Video 3]; and "Cler. Co. 264 – 00015 Cassandra Debord," 3 minutes and 19 seconds in length [hereinafter Handheld Video 4]. In addition to Newsome's handheld camera, footage from three stationary cameras in the booking area depict at least some of the relevant events, without audio. Two cameras were positioned from behind the booking counter. The footage from these cameras was provided to us as files named "Cler. Co. 266 – 20210228-RTR-Booking-LovellMark-02 – 117 Booking Counter Right," 10 minutes and 11 seconds in length [hereinafter Booking Counter Right Video], and "Cler. Co. 266 – 20210228-RTR-Booking-LovellMark-02 – 119 Booking Counter Left," 10 minutes and 10 seconds in length [hereinafter Booking Counter Left Video]. A third camera was positioned at the left end (if one is facing the counter) of the hall in front of the booking counter. This footage is "Cler. Co. 266 – 20210228-RTR-Booking-LovellMark-02 – 169 Booking," 10 minutes and 9 seconds in length [hereinafter Booking Hall Video].

In all, video captured much of what transpired from Lovell's arrival at the jail onward. When Lovell arrived at the jail his speech was slurred and he had some difficulty walking on his own. Handheld Video 1 at 00:39–01:00. The officers conducted an initial pat down search of Lovell in the sallyport, and Lovell was compliant but made a few obnoxious comments. *See id.* at 01:00–02:10. Bailey held Lovell's right arm, and Mullenix held his left. During this initial pat down, Lovell began to complain that Bailey was gripping his arm too tightly. *Id.* at 02:00–08.

The officers then escorted Lovell to the booking desk, *id.* at 02:10–19, where they booked him and completed a second pat-down search, *id.* 02:20–04:38. Officer Shouse completed Lovell's intake from behind the booking counter. *Id.* Bailey still held Lovell's right arm, and Mullenix his left. Pemberton, Paff, and Newsome looked on without apparent concern. *See, e.g.*, Booking Counter Left Video at 02:50–03:12. Pemberton stood behind Lovell and conducted the actual pat down. Handheld Video 1 at 04:05–25. Lovell continued to make obnoxious comments, *see generally id.*, and to complain about Bailey's grip on his right arm, *see, e.g.*, *id.* at 02:22, 02:36–41, 02:52–53, 03:03–04, 03:27–32, 03:35–36 ("He needs to loosen up."), 03:47–49 ("Man, loosen up, dog."), 03:50–51 ("Loosen the fuck up."), 03:55–57 ("Where the fuck am I gonna go? I'm in jail, dude."), 04:18–20, 04:23–24 ("Get the fuck off my arm."), 04:27–28. Officers were able to remove Lovell's necklace and wedding ring without incident. *Id.* 03:07–10, 03:17–24. They several times told Lovell to relax and, in response to one of his complaints about Bailey, that they were holding him up so he wouldn't fall. *Id.* at 03:56–04:02. Lovell occasionally moved or pulled his right arm while complaining about Bailey's grip. *See, e.g.*, *id.* at 04:18–19. At no point during booking did the officers appear to have difficulty restraining or controlling Lovell.

The officers then walked Lovell a few steps to the left where the on-duty nurse, Nurse Irwin, was waiting. *Id.* at 04:37–40. Bailey told Lovell to "stop tensing up" and "fucking chill out," while Nurse Irwin took Lovell's temperature via forehead scan. *Id.* at 04:40–44. Lovell again told Bailey to "get off [his] arm," at one point flexing and extending his forearm. *Id.* at 04:44–49. Lovell meanwhile turned to Mullenix on his left side and said, "Tell him to get off my fucking arm." *Id.* at 04:50–53. Lovell continued to complain about Bailey's hold, remarking

that Bailey was "trying to break" Lovell's arm. *Id.* at 04:56–57. Nurse Irwin attempted to place a pulse oximeter on Lovell's right hand, but when Lovell jostled that arm she calmly moved it to his left. Booking Counter Right Video at 04:17–24; Booking Hall Video at 04:20–23. While Nurse Irwin took his pulse, Lovell began shifting his weight back and forth. The officers told Lovell several times to "chill out," "stop," and "loosen up your hand." Handheld Video 1 at 05:16–25. Lovell appears to try to grab the counter with his right hand, apparently for balance, and Bailey immediately redirected Lovell's arm back down to his side. Booking Hall Video at 04:27–29.

Paff then took hold of Lovell's right arm (in addition to Bailey). *See* Booking Counter Right Video at 04:35; Booking Counter Left Video at 04:41–44. The group (Lovell, Bailey, Mullenix, and Paff) then started to shuffle sideways to the right, away from Nurse Irwin, as the officers continued to tell Lovell to "relax your hand" and "loosen up your hand." Handheld Video 1 at 5:25–28. Paff appears to have been pulling Lovell's right arm towards Paff. Booking Counter Right Video at 04:35–40. The group then moved down the hall toward a waiting restraint chair. At this point, Mullenix held Lovell's left arm, Bailey and Paff held Lovell's right arm, Pemberton was behind Lovell holding onto and pulling the back of Lovell's shirt, and Tincher was in front of and to the left of Lovell. Handheld Video 1 at 05:27–30. That is, five officers (each of whom was larger than Lovell) surrounded and held onto Lovell. They continued to tell Lovell to "stop." *Id.* Lovell's right hand can be seen open. *Id.* at 5:28–30; Booking Hall Video at 04:40–42.

### 2. First Use of Force

A few steps in front of the restraint chair, Paff extended his left leg in front of Lovell to trip him, Booking Hall Video at 04:42–44; Handheld Video 1 at 05:31, and the officers took Lovell down to the floor. As he hit the floor on his stomach, Lovell's arms were extended behind his back, still held by Mullenix on the left and Bailey on the right. Booking Hall Video at 04:47–52; Handheld Video 1 at 05:36–37. Before Lovell reached the floor, Newsome began to call out "stop resisting" from behind his handheld camera, Handheld Video 1 at 05:34–37, one

officer yelled for Lovell to "give us your hands," *id.* 05:35, Paff struck[2] Lovell once in the right shoulder area, *id.* at 05:35–36, and Tincher grabbed his pepper spray, Booking Hall Video at 04:48–51. Once Lovell was on the ground, Tincher held down Lovell's neck with his free hand. Booking Hall Video at 04:51. He then announced, "OC," and sprayed the pepper spray directly into Lovell's face from a distance of a few inches. *Id.* at 04:52–54. Tincher appears to then rub the pepper spray on Lovell's face. *Id.* at 04:54–56.

At this point, Bailey was still on Lovell's right side, Tincher was on Lovell's left by his face, Mullenix was on Lovell's left by his waist and legs, and Pemberton was in front of Lovell's head. *See id.*; Handheld Video 1 at 05:41. Bailey had his left knee on Lovell's lower back, and Mullenix had his left knee on Lovell's legs. Handheld Video 1 at 05:41. The officers continued to tell Lovell to "stop resisting" and "put your hands behind your back." *Id.* at 05:41–43. Tincher then struck Lovell three times on Lovell's left shoulder area, *id.* 05:43–44; Booking Hall Video at 04:57–58, Bailey struck Lovell once on his right shoulder area, Handheld Video 1 at 05:44–45; Booking Hall Video at 04:58, Pemberton struck Lovell three times on his upper back, Booking Hall Video at 04:58–59, and Mullenix struck Lovell twice on his lower back, Handheld Video 1 at 05:45–47. These nine strikes took place within a span of about two to three seconds. After Paff briefly blocked the handheld camera's view, Lovell can be seen with the left side of his face pressed against the floor with blood splatter on the ground near his nose and mouth. Handheld Video 1 at 05:48–50. During this time, Bailey had Lovell's right arm secured against the floor. Booking Hall Video at 04:52–59. Pemberton, still by Lovell's head, then struck Lovell three times on his upper back, with more blood spatter resulting from the strikes. *Id.* at 05:03–04; Handheld Video 1 05:49–50.

After these strikes, Tincher and Mullenix clearly held Lovell's left arm and Bailey his right, while Paff put handcuffs around Lovell's wrists behind Lovell's back. Handheld Video 1 at 05:57–06:10. Meanwhile, Shouse came around from behind the counter and slipped a spit hood on Lovell's head (still on the ground). *Id.* Bailey, apparently also hit by the pepper spray, walked away with Shouse's assistance. *Id.* at 06:04–07. Tincher, Mullenix, Pemberton, and Paff

---

[2]Not every strike mentioned throughout this opinion can be seen in full on the video. Each strike that can be seen, however, appears to be a closed-fist punch.

then lifted Lovell off of the ground by his wrists and arms, extended into the air behind him, as well as by the back collar of his shirt, while telling him to "stand up." *Id.* at 06:08–15. The officers immediately placed Lovell in the restraint chair and affixed the restraints. *Id.* at 06:17–07:20. Lovell can be heard asking something along the lines of, "What'd I do, man?," to which one of the officers replied, "You weren't listening." *Id.* at 06:23–28. Lovell appears limp, with the bloody spit hood over his head. *See id.* at 06:26–07:24. Nurse Irwin approached Lovell and checked his restraints. *Id.* at 07:26–37.

Tincher rolled Lovell down the hall and into a holding cell in the restraint chair. *Id.* at 07:37–08:30. Nurse Irwin returned, and Lovell was pulled slightly out of the cell while Nurse Irwin checked his blood pressure. *Id.* at 08:38–10:07. Lovell can be heard saying he "need[s] his eyes screened," *id.* at 08:43–46, to which Paff replied, "No, you need to start listening before you come out of that chair and get that stuff taken care of," *id.* at 08:47–52. Lovell said something else about his eyes and Nurse Irwin responded, "No, I can't do that, hon." *Id.* at 09:16–18. As Nurse Irwin took his blood pressure, Lovell said, "Ow, my eyes," and rolled his head back against the chair. *Id.* at 09:39–41. After Nurse Irwin finished, Pemberton rolled Lovell back into the cell, positioned one of the restraint straps to be held in the door, and closed the door. *Id.* 10:15–26.

### 3. Second Use of Force

About two hours later, Bailey and Paff wheeled Lovell out of the cell. Handheld Video 2 at 00:04–10. Newsome once again recorded the events on a handheld camera. Lovell was slumped forward in the restraint chair. *Id.* Bailey and Paff attempted to rouse Lovell by calling his name and tapping him. *Id.* at 00:10–14. When that failed, Bailey used a sternum rub and Lovell awoke. *Id.* at 00:15–16. Lovell became unresponsive several seconds later and had to be roused with a sternum rub once again. *Id.* at 00:17–33. Lovell appeared disoriented and agitated, yelling "hey" and "no" as he came to. *Id.* at 00:34–51. He was minimally responsive as Bailey and Paff told him they were going to remove him from the restraint chair and "get [him] changed out," *id.* at 00:52–01:02, but nodded when Bailey made eye contact and asked Lovell if he was going to comply, *id.* at 01:02–04. Bailey, Pemberton, and Paff then wheeled

Lovell down the hall to the shower room. *Id.* at 01:08–32. Mullenix joined the group outside of the shower room. *Id.* at 01:32.

The officers then undid Lovell's restraints. Lovell moved only to stretch his wrists and neck where the restraints had been. *Id.* at 01:33–02:00. Bailey, holding Lovell's left arm, and Paff, holding his right, then assisted Lovell into a standing position. *Id.* at 02:03–06. Lovell demonstrated considerable difficulty walking several feet from the chair to the shower, even with Bailey and Paff holding and assisting him. *Id.* at 02:10–30. Lovell mumbled something, to which Paff responded, "Legs hurt? I getchya." *Id.* at 02:17–19. Mullenix followed them into the bathroom, and Pemberton stood in the doorway, holding the door partially open. *Id.* at 02:35–38. Newsome stayed behind, filming Pemberton's back in the doorway. *Id.* at 02:38–03:48. The officers can be heard telling Lovell that they are going to remove his clothes and asking him to stand up to do so. *Id.* Lovell said something about his "fucking leg" and asked why they "gotta have ten sheriffs?" *Id.* at 03:30–33. Mullenix stepped forward toward Lovell, who said something about "ten guys." *Id.* at 03:46–47. Pemberton then stepped into the shower room and allowed the door to close behind him. *Id.* at 03:52–54. Newsome remained outside, filming the closed door. *Id.* 03:54–04:02.

While the door was closed, the officers and Lovell exchanged words. Lovell then audibly responded, "Boy? Who the fuck you calling boy?" *Id.* at 03:57–04:01. There was some noise from within the shower room, and Newsome, still holding the camera, rushed to the door and pulled it open. *Id.* at 04:01–04. Shouse also ran over and into the shower room. *Id.* When the door opened, Lovell was sitting hunched over on the shower bench against the wall, with Bailey, Mullenix, Pemberton, and Paff surrounding him. *Id.* at 04:03–04. As he entered, Newsome yelled, "Stop resisting," and the other officers began yelling the same. *Id.* at 04:04–06. Bailey, Mullenix, Pemberton, and Paff then pulled Lovell up from the bench. Lovell remained bent over as he stood, covering his face with his hands. *Id.* at 04:06–08. The group shuffled forward with Mullenix and Pemberton holding Lovell's right arm away from his body, Paff attempting to pull Lovell's left hand from Lovell's face, and Bailey doing something not fully captured on video by Lovell's lower body. *Id.* The officers yelled at Lovell to "get on the ground." *Id.*

Bailey reached his right arm between Lovell's legs, lifted Lovell's lower body into the air, and then put him on the ground. *Id.* at 04:08–10. Shouse, Mullenix, and Pemberton surrounded Lovell on the ground while Newsome yelled, "Get on the ground put your hands behind your back." *Id.* at 04:10–13. Pemberton appeared to retain his hold on Lovell's right arm, which was extended in front of Lovell's face, as Lovell hit the floor on his stomach. *Id.* Pemberton then struck Lovell two times in quick succession, and a third time a second later. *Id.* at 04:12–14. Mullenix struck Lovell once. *Id.* Newsome continued to yell, "Put your hands behind your back," and another officer yelled, "Give me your fucking hands." *Id.* at 04:14–16. It seems that Lovell's hands were on the back of his neck with Pemberton holding his right wrist. *Id.* at 04:16. Pemberton delivered another strike, followed by two from Mullenix, and three from Shouse on Lovell's right leg. *Id.* at 04:16–20. At the same time, Paff unholstered his pepper spray. *Id.* Pemberton kneed Lovell's right shoulder once, and Bailey kneed Lovell once in the left side and then appeared to climb on top of Lovell's lower body. *Id.* at 04:20–21.

One second later, Paff leaned forward and deployed pepper spray into Lovell's face at close range. *Id.* at 04:22–23. Pemberton removed his left hand from Lovell's wrist, placed that hand on Lovell's left shoulder, and used his right hand to strike Lovell an additional four times on his right shoulder. *Id.* at 04:24–25. Bailey kneed Lovell twice in his left torso, *id.* at 04:27–28, struck him five times, *id.* at 04:29–32, then kneed him twice more, *id.* at 04:33–36. At this point Lovell had curled slightly onto his right side. *See id.* Newsome yelled for Lovell to "stop resisting, roll your belly, [and] put your hands behind your back." *Id.* at 04:37–38. Pemberton struck Lovell four more times. *Id.* at 04:37–41. Newsome continued to yell, "Put your hands behind your back," to which Lovell at one point responded, "I am." *Id.* at 04:38–42. Bailey had Lovell's left leg pinned with his knees, while Shouse bent Lovell's right leg into unnatural positions. *Id.* at 04:42–45. Bailey kneed Lovell three times. *Id.* at 04:52–55. Pemberton struck him once. *Id.* at 04:55. Mullenix struck him six times. *Id.* at 04:48–05:02. Pemberton struck him again. *Id.* at 05:04. Paff can be seen holding Lovell's left arm while Bailey struck Lovell in the left thigh. *Id.* at 05:06–08. Paff then handcuffed Lovell's wrists behind his back. *Id.* at 05:10–22.

As the officers stood up, Lovell remained motionless on the floor. *Id.* at 05:23–30. Newsome retreated out of the shower cell and down the hallway with the handheld camera. *Id.* at 05:32–37. Pemberton, Bailey, and Paff then emerged from the shower cell with Lovell, who had a new spit hood on his head. *Id.* at 05:39–43. Lovell leaned very far forward, and the officers appear to have been partially carrying him, with his feet dragging on the floor. *Id.* Lovell stumbled backward a few steps into a waiting restraint chair. *Id.* at 05:43–46. As the officers placed the restraints, Lovell said, "You guys got me." *Id.* at 05:36–06:02. Newsome responded, "Why'd we have to get you again, man? All we wanted you to do was change out. And shower." *Id.* at 06:06–08. Lovell said, "I didn't do nothing," to which Newsome replied, "We don't do something when you do nothing, bud." *Id.* at 06:16–20.

The officers rolled Lovell in the restraint chair back down the hall. *Id.* at 08:12–24. Nurse Irwin walked over and checked Lovell's restraint points. *Id.* at 08:24–36. The officers then placed Lovell back in a holding cell. *Id.* at 08:36–09:07.

### 4. Aftermath

Approximately two hours later, Mullenix, Pemberton, and Paff removed Lovell from the cell and rolled him in the restraint chair back down the hall to the shower room. Handheld Video 3 at 00:00–37. The officers removed Lovell's restraints, and red marks can be seen on his wrist and back. *Id.* at 01:29–45. Again, Pemberton and Paff assisted Lovell as he walked with considerable difficulty a few feet from the chair into the shower room. *Id.* at 01:45–55. Lovell exhibited a limp. *Id.* This time, Newsome held the door open and continued to film inside the shower room as Lovell removed his clothes. *Id.* at 02:17. Lovell made several comments about his poor physical condition. *Id.* at 03:30–34 ("They beat me . . . they got me good."); *id.* at 03:45–47 ("I can't move."); *id.* at 03:50–54 ("These motherfuckers beat me up, man."). Lovell required Paff's assistance to rise from the bench. As he did, he remarked, "Aw man, I'm fucked up. They fucked me up, man." *Id.* at 04:14–20. Lovell declined a shower and Paff and Pemberton helped Lovell put on his jail-issued garb. *Id.* at 05:15–00:07:35. At Newsome's suggestion, Paff wet a towel to wipe Lovell's face and offered to "help him get some of that pepper spray off" because "his face will be super agitated." *Id.* at 06:20–51. Lovell declined. *Id.* at 06:50–51.

Lovell again required substantial assistance as he stumbled out of the shower room, hunched over. *Id.* at 07:40–50. He said to Paff, "They got me bad" and "I think I need to see somebody right now." *Id.* at 07:40–46. Paff told Mullenix to retrieve a wheelchair. *Id.* at 07:50–54. With Paff and Pemberton holding up his arms, Lovell limped partway down the hallway. He could not travel the full distance, and Nurse Irwin came to him. *Id.* at 06:54–08:16. Nurse Irwin checked Lovell's wrists and ankles. *Id.* at 08:17–26. Lovell told her, "It's my upper body." *Id.* at 08:26–29. She did not check his abdomen. As Lovell got into the wheelchair he said, "These fools fucked me up." *Id.* at 09:10–13. He winced and moaned in pain, clutching the right side of his back, and had difficulty sitting in the wheelchair. *Id.* at 09:12–34. He said to Paff, "You beat me, man." *Id.* at 09:34–36. At about 4:30 a.m., *see* R. 57-5 (Restraint Check Log at 2) (Page ID #1060), the officers wheeled Lovell to a holding cell and deposited him on the bed. He continued to moan and exclaim. *See generally* Handheld Video 4.

Several hours later, at about 11:30 a.m., a different nurse examined Lovell and ordered x-rays. R. 57-7 (Medical Records at 8) (Page ID #1070). The x-rays showed multiple fractured ribs, flail chest, and a possible pneumothorax. *Id.* at 22 (Page ID #1084). Lovell was transferred to Clermont Mercy Hospital, R. 58-14 (Incident Report at 1) (Page ID #1409), where a CT scan confirmed the multiple fractured ribs and a pneumothorax, *see* R. 57-7 (Medical Records at 34) (Page ID #1096). Clermont Mercy then transferred Lovell to the University of Cincinnati Medical Center's Trauma Center. R. 58-14 (Incident Report at 2) (Page ID #1410). Lovell was admitted and remained in the hospital for three days until his discharge on March 3. R. 57-7 (Medical Records at 28) (Page ID #1090).

## B. Procedural Background

On February 25, 2023, Lovell filed a civil complaint pursuant to 42 U.S.C. § 1983 claiming, in relevant part, that Bailey, Mullenix, Tincher, Pemberton, Shouse, and Paff [hereinafter the Defendant Officers] used excessive force against him in violation of his Fourth and Fourteenth Amendment rights. R. 1 (Compl. at 11) (Page ID #11); R. 23 (Am. Compl. at

12–13) (Page ID #163–64).**³**   The Defendant Officers moved for summary judgment.   On January 2, 2026, the district court granted summary judgment to Shouse as to Count 1 (regarding the first use of force) and to Tincher as to Count 2 (regarding the second use of force) on the basis of qualified immunity.   The district court otherwise denied the Defendant Officers' motion for summary judgment on Lovell's excessive-force claims, concluding that the officers were not entitled to qualified immunity.   The Defendant Officers timely appealed.   R. 86 (Notice of Appeal at 1) (Page ID #3189).   Lovell moved to dismiss the appeal for lack of jurisdiction.   D. 20 (Mot. to Dismiss).

## II.  ANALYSIS

The Defendant Officers argue that the district court erred in denying them qualified immunity based on its holding that "a genuine issue of material fact exists concerning whether a constitutional violation occurred."   D. 18 (Appellants Br. at 7).   In the Defendant Officers' telling, the district court improperly "assessed the incontrovertible record evidence," which in their view shows that the Defendant Officers' conduct did not violate the Fourth Amendment. *Id.* at 9.   The Defendant Officers' argument falters right out of the blocks.   As discussed below, our jurisdiction over interlocutory appeals of qualified-immunity denials is sharply circumscribed.   On appeal, the Defendant Officers fail to concede the facts as they must.   And the video evidence does not blatantly contradict Lovell's version of events.   We thus lack jurisdiction over this appeal.   Accordingly, we grant Lovell's motion to dismiss the appeal.

We have jurisdiction to review a district court's denial of qualified immunity on summary judgment under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 526–28 (1985).   Such jurisdiction, "however, is narrow." *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008).   "[O]ur review is limited to 'only purely legal questions.'" *Gordon v. Bierenga*, 20 F.4th 1077, 1081 (6th Cir. 2021) (quoting *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019)).   "A defendant seeking interlocutory review 'may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a

---

**³**Lovell also brought other claims against the officers, claims against Nurse Irwin and her employer, and against claims the Clermont County Board of Commissioners and Sheriff.   R. 23 (Am. Compl. at 13–21) (Page ID #164–72).   Those are not at issue in this appeal. *See* R. 86 (Notice of Appeal at 1) (Page ID #3189).

"genuine" issue of fact for trial.'" *Kilnapp v. City of Cleveland*, 167 F.4th 909, 917 (6th Cir. 2026) (quoting *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995)). "[T]his limitation ensures that" our review of such decisions "remains confined to the denials of qualified immunity and does not bleed over into a review of district courts' evaluation of genuine disputes of material fact." *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016). "The 'onus is on the defendant to comply with this jurisdictional limit.'" *Gillman v. City of Troy*, 126 F.4th 1152, 1158 (6th Cir. 2025) (quoting *Gillispie v. Miami Township*, 18 F.4th 909, 915 (6th Cir. 2021)).

As we recently reaffirmed, "[o]ur circuit has 'recognized two narrow exceptions to the rule prohibiting fact-based interlocutory appeals.'" *Cotton v. Hughes*, 176 F.4th 886, 898 (6th Cir. 2026) (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)). First, a defendant may invoke our jurisdiction by "conced[ing] the most favorable view of the facts to the plaintiff for purposes of the appeal." *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002) (quoting *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)). But still, "[o]ur jurisdiction ends once a defendant's argument 'drifts from the purely legal into the factual realm and begins contesting what really happened.'" *Cockrun v. Berrien County*, 101 F.4th 416, 422 (6th Cir. 2024) (quoting *Berryman*, 150 F.3d at 564–65). Second, "'in exceptional circumstances' we may overrule a district court's determination that a factual dispute exists where evidence in the record establishes that the determination is 'blatantly and demonstrably false.'" *Cotton*, 176 F.4th at 898 (quoting *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)). This is particularly relevant in cases with video evidence that clearly depicts what happened. *See LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022). Even with video evidence, however, "we must nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff.'" *Id.* (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).

Here, the Defendant Officers themselves describe their appeal as challenging the district court's "determination that a genuine issue of material fact exists as to whether the Defendant Officers' actions violated a clearly established constitutional right," D. 18 (Appellants Br. at 2)—the very thing we are prohibited from reviewing, *see Johnson*, 515 U.S. at 319–20. Thus, we

lack jurisdiction over this appeal unless one of the exceptions applies. As explained below, neither does.

**A. The Defendant Officers Fail to Concede the Facts**

The Defendant Officers profess to "accept[] the record taken in the videos and in [Lovell]'s light." D. 18 (Appellants Br. at 3); *id.* at 9 ("[T]he Defendant Officers accept the facts as depicted by the videos and [Lovell]'s assertions as supported by competent evidence in the record . . . ."); D. 24 (Opp'n to Mot. to Dismiss at 6) (stating that "Defendants do not wish to quibble about facts"). Their recitation of facts and the substance of their briefing, however, belie their concession. Three important examples will suffice on this point. *Cf. White v. Hamilton County*, No. 23-5384, 2024 WL 1257508, at *2 (6th Cir. Mar. 25, 2024).

One: The district court concluded that "the video of the booking area incident," i.e., the first use of force, "does not show Lovell deliberately and actively pulling away before Paff executed his take-down maneuver." R. 85 (D. Ct. Op. at 27) (Page ID #3154). In the Defendant Officers' opening brief before this court, however, they recite as fact that as they attempted to move Lovell from the booking counter to the restraint chair, Lovell "continued to be noncompliant, tense his arm muscles, and try to pull away from the officers." D. 18 (Appellants Br. at 5). Later in their brief, as support for their argument that Lovell was actively resisting, they state again that Lovell was "struggling and trying to pull away from the Defendant Officers as he was being escorted to the restraint chair." *Id.* at 14.

Two: The district court found that "the video appears to support [Lovell]'s assertion that neither arm was tucked beneath his body." R. 85 (D. Ct. Op. at 27) (Page ID #3154). By contrast, the Defendant Officers continue to assert on appeal that "[w]hile on the ground" during the first use of force, "[Lovell] . . . wrestl[ed] his right arm from an Officer's control and tuck[ed] it under his body." D. 18 (Appellants Br. at 6); *id.* at 15 ("The footage [from the Booking Hall Video] clearly shows [Lovell] pull his arm away from the [officers'] hold and place it under his body. This footage also depicts the Deputy's repeated attempts to remove [Lovell]'s arm from under [Lovell]'s body.").

Three:   The Defendant Officers repeatedly state that Lovell "charged" Mullinex in the shower room before the second use of force.  D. 18 (Appellants Br. at 6, 17).  Again, the district court concluded otherwise—"the extensive video record casts doubt on the statements in the [Response to Resistance] report and allows a reasonable jury to discredit the Officers' accounts." R. 85 (D. Ct. Op. at 30).

As these examples demonstrate, the Defendant Officers' concession was not "genuine"— rather, the Defendant Officers merely "'purport[] to concede the plaintiff's view of the facts' for the purposes of attaining appellate jurisdiction but then 'in effect still litigate[] the factual dispute.'"  *Gillman*, 126 F.4th at 1159 (alterations in original) (quoting *Anderson-Santos v. Kent County*, 94 F.4th 550, 554–55 (6th Cir. 2024)).  Although the Defendant Officers state that they accepted the record, they go on to "raise[] arguments that relied on material and 'disputed' facts."  *Id.*  Indeed, the three facts discussed above "are the very disputes of material fact on which the district court relied in denying the motion for summary judgment."  *Cotton*, 176 F.4th at 901 (citation modified).   "[A] concession in name only is no concession at all," so the Defendant Officers' attempt to invoke our jurisdiction on that basis fails.  *Anderson-Santos*, 94 F.4th at 554.

**B.      The District Court's Determination that a Genuine Factual Dispute Exists Is Not Blatantly Contradicted by the Record**

The Defendant Officers also argue that the district court's adverse findings are "blatantly contradicted" by the record, such that we may overrule them and retain appellate jurisdiction. D. 18 (Appellants Br. at 13); *see also, e.g.*, D. 24 (Opp'n to Mot. to Dismiss at 4).  But the videos evince no such blatant contradictions.  We use the same three examples as above.

Lovell "pull[ed] away from the officers" in the lead-up to the first use of force.  D. 18 (Appellants Br. at 5, 14).  The videos show some jostling in the space between the counter and the restraint chair as Lovell was surrounded, held, and led by five officers (all of whom dwarf him in size).  *See* Handheld Video 1 at 05:27–30; Booking Counter Left Video at 04:40–45.  It is unsurprising that six people would have difficulty walking as a single cohesive group.  Indeed, although it is not clear, Pemberton appears to have held onto Lovell's shirt and pulled it backwards at the same time Paff pulled Lovell forward.   Handheld Video 1 at 05:27–30.

Furthermore, Lovell's right hand can be seen unclenched and open, in compliance with the officers' orders. Booking Hall Video at 04:40–42. Overall, the videos do not unmistakably show Lovell pulling away from officers before they took him to the ground.

Lovell "tuck[ed] [his arm] under his body" during the first use of force. D. 18 (Appellants Br. at 6, 15). As Lovell reached the ground, his arms were pulled up behind his back, held by Mullenix on the left and Bailey on the right. Booking Hall Video at 04:47–52; Handheld Video 1 at 05:36–37. The video then shows Bailey holding Lovell's right arm against the floor, straight out and perpendicular to Lovell's body, as Lovell hit the floor. Booking Hall Video at 04:50. Bailey moved Lovell's arm toward Lovell's head for a moment, and then back to being extended perpendicularly again. *Id.* at 04:53–54. Bailey retained his hold as he bent Lovell's arm to place his wrist behind his back. *Id.* at 04:55–05:06; *see also* Handheld Video 1 at 05:42–44 (showing Bailey's left hand pinning Lovell's right upper arm); *id.* at 05:45 (showing Lovell's right wrist next to his torso). To the extent that Bailey had a less secure grip on Lovell's arm at any point, it was because Bailey moved one of his own hands to shield himself from the pepper spray. *See id.* at 05:40–41. As for Lovell's left arm, video depicts it pinned on the floor, straight, between Tincher's body and his own torso. Booking Hall Video at 04:50–52. At no point does the video show Mullenix losing his hold on Lovell's left arm. And several seconds later, as the strikes were ongoing, Lovell's full left arm can be seen on the floor next to his torso, with Mullenix holding Lovell's wrist. Handheld Video 1 at 05:41–44.

Lovell "charged" Mullenix before the second use of force. D. 18 (Appellants Br. at 6, 17–19). The moment Lovell supposedly charged Mullenix occurred off camera. Less than three seconds elapsed from when there was an unidentifiable noise in the shower room to when the door opened and Lovell can be seen sitting hunched over on the shower bench with officers surrounding him. Handheld Video 2 at 04:01–04. And Lovell had required substantial assistance to limp the few feet from the restraint chair to the shower room. *Id.* at 02:10–30. It beggars belief that less than two minutes later, that same individual suddenly had the energy and strength to charge someone, let alone that he did so and was returned to his position on the bench within a span of several seconds. The Defendant Officers support their allegation that Lovell charged Mullenix with only the officers' own "Response to Resistance" reports. *See* D. 18

(Appellants Br. at 17).  Although a plaintiff's memory lapse might not, standing alone, create a genuine dispute of fact, *see Farris v. Oakland County*, 96 F.4th 956, 966 (6th Cir. 2024), Lovell's beleaguered state immediately preceding his alleged attack is ample circumstantial evidence from "which a reasonable jury could choose to disbelieve" the Defendant Officers' account, *Gillman*, 126 F.4th at 1159.

As these examples show, the district court's determination that there is a genuine dispute of material fact is not blatantly contradicted by the record.  *See Heeter v. Bowers*, 99 F.4th 900, 910 (6th Cir. 2024) (concluding that the video evidence in that case "allows us to reject [the officer]'s contention that the factual determinations underlying the district court's excessive force decision were 'blatantly contradicted by the record'"); *Hooks v. City of Warren*, No. 24-1375, 2025 WL 1542294, at *5 (6th Cir. May 30, 2025); *Alfatlawy v. City of Detroit*, No. 24-1080, 2024 WL 4635383, at *4 (6th Cir. Oct. 31, 2024).

* * *

In sum, "in this appeal, the facts are everything." *Perez v. Simpson*, 83 F.4th 1029, 1031 (6th Cir. 2023).  The Defendant Officers place contested facts at the heart of their appeal, and they fail to concede Lovell's version or to demonstrate that the district court's view of those facts is "blatantly contradicted" by the record.  We therefore lack jurisdiction.  *See Bell v. City of Southfield*, 37 F.4th 362, 366 (6th Cir. 2022) ("Without (1) a concession of [the plaintiff]'s version of the [facts] or (2) video evidence that blatantly contradicts or utterly discredits [the plaintiff]'s account, we are left with a factual dispute over which we do not have jurisdiction.").

We are mindful of our prior statements that we must not "throw[] up our hands whenever the parties disagree over the facts" and instead must "separate the legal wheat from the factual chaff and proceed." *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 608–09 (6th Cir. 2025) (citation modified).  But the factual disputes in this appeal are "'crucial to' the qualified immunity question." *Gillman*, 126 F.4th at 1160 (quoting *Phelps*, 286 F.3d at 298).  Whether Lovell was actively resisting prior to and during the takedown in the first use of force, and whether he moved to attack an officer before the second use of force, are at the heart of the legal question of whether the Defendant Officers violated Lovell's rights and whether they are entitled

to qualified immunity. Thus, "'we may not simply ignore' the[se] dispute[s], and we must dismiss for lack of jurisdiction." *Ramsey v. Rivard*, 110 F.4th 860, 866 (6th Cir. 2024) (quoting *Adams v. Blount County*, 946 F.3d 940, 951 (6th Cir. 2020)).

### III.  CONCLUSION

For the foregoing reasons, we **GRANT** Lovell's motion to dismiss, and we **DISMISS** the appeal.